# CIRCUIT COURT OF THE CITY OF NORFOLK

Anne Owens

    v.

City Council of the
City of Norfolk et al.

March 7, 2008

Case No. (Civil) L07-5025

BY JUDGE NORMAN A. THOMAS

In this letter opinion, the Court will explain the reasons for its decision to temporarily enjoin the defendant Director of the Department of Planning and Community Development ("the director") from issuing any building permit to Christ and St. Luke's Episcopal Church ("CSL") pursuant to the certificate of appropriateness issued to it by Norfolk City Ordinance No. 42,833. In addition, for the reasons explained below, the Court has determined that CSL is a necessary party to this case and will order that the plaintiff join CSL as a party defendant or suffer dismissal of the lawsuit.

## I. *Background*

In this case, the plaintiff, Anne Owens, seeks declaratory relief pursuant to Virginia Code § 8.01-184 et seq., as well as both preliminary and permanent injunctive relief against the City Council of the City of Norfolk, its

Planning Commission, and its Director of the Department of Planning and Community Development, acting in his official capacity (collectively referred to as "the City"). Her allegations focus upon that portion of the City's zoning ordinance which pertains to the HC-G2 District wherein she owns her residence and the procedural process by which a landowner in that district may obtain the City's authorization to build a structure taller than 35 feet in height.

On September 11, 2007, acting pursuant to zoning ordinance §§ 9-0.4 and 9-1.8, City Council enacted Ordinance No. 42,833, wherein it granted CSL a certificate of appropriateness to construct a large scale addition to the church that will total 53 feet in height.

Zoning ordinance § 9-0.4 outlines the process by which a landowner in one of Norfolk's Historic and Cultural Conservation districts (hereinafter "historic districts") may obtain a certificate of appropriateness to alter the exterior appearance of or demolish or construct any building or structure within such district. Zoning ordinance § 9-1.8 pertains to height requirements in the three historic districts comprising Norfolk's Ghent neighborhood as follows:

> Height requirements.
> (a) *Maximum height*: 35 feet.
> (b) *Minimum height*: 25 feet.
> (c) *Variations from height limits*: Notwithstanding the above provisions, where certificates of appropriateness approve greater or lesser heights, on grounds of existing conditions, relationships to adjacent buildings and open space, protection of views, or similar considerations, such heights shall be permitted as authorized variations from the height requirements established in § 9-1.8(a) and (b).

Anticipating that the city would grant CSL's applied-for certificate of appropriateness, Owens filed this action on August 21, 2007. Thereafter, the Court heard and decided a number of issues raised on demurrer, special pleas, and motions. On October 24, 2007, Owens filed her Amended Complaint for Declaratory and Injunctive Relief. On February 4, 2008, the parties appeared and, building upon the record thus far established in the case, presented additional evidence upon and argued Owens' motion for preliminary injunctive relief.

In her amended complaint, Owens alleges that the process enacted by the City and applied in this case to grant CSL a certificate of appropriateness to construct a 53 foot tall addition exceeds the scope of applicable state

enabling legislation and otherwise fails to pass constitutional muster in several respects. Specifically, Owens contends that the process of granting CSL an "authorized variation" from the 35 foot maximum height limitation applicable to the HC-G2 district constitutes an "illegal variance." Owens asserts that the process of zoning ordinance § 9-0.4, respecting issuance of certificates of appropriateness, as enacted and utilized here for relief from the applicable maximum height limitation in Norfolk's HC-G2 district, does not include Board of Zoning Appeals ("BZA") or appropriate judicial review. Therefore, she contends, that process unlawfully excludes surrounding property owners and other affected persons from participation in that process.

As a result of the certificate of appropriateness process' alleged deficiencies, Owens seeks declaratory and injunctive relief on the following bases: That the certificate of appropriateness process as it pertains to the district's maximum height limitation violates "Dillon's Rule" and therefore is void,[1] and that it violates her constitutional rights to procedural due process, substantive due process, and equal protection of laws guaranteed to her by the Fourteenth Amendment to the United States Constitution.

Owens seeks both preliminary and permanent relief to enjoin the City's Planning Commission and Council from "approving illegal variances under the guise of authorized variations," and to enjoin the director "from issuing any permit of any kind for any project in the HC-G2 District calling for the erection of any structure that exceeds 35 feet or otherwise violates the provisions of the [zoning ordinance] unless said project has received a variance from the Board of Zoning Appeals." In her pleadings and through her counsel's argument before the Court, Owens asserts that her request for preliminary injunctive relief seeks to enjoin the director from issuing either building or demolition permits pursuant to CSL's certificate of appropriateness.

---

[1] Dillon's Rule holds that a municipal corporation, as a political subdivision of the state, possesses only those powers legislatively granted to it and those powers fairly implied from or indispensable to such express grants of power. *See discussion, City of Richmond v. Henrico Board of Supervisors*, 199 Va. 679, 684-85, 101 S.E.2d 641, 644-45 (1958). The Dillon's Rule of strict construction invalidates municipal ordinances and renders void municipal actions that exceed the reasonable scope of powers so granted through enabling legislation. *Id.; see also, Augusta County Board of Supervisors v. Countryside Investment Co.*, 258 Va. 497, 502-03, 522 S.E.2d 610, 612-13 (1999); *Fairfax County Board of Supervisors v. Horne*, 216 Va. 113, 117, 215 S.E.2d 453, 455-56 (1975). Nevertheless, the Court makes clear that local zoning ordinance provisions, such as those at issue in this case, enjoy a rebuttable presumption of validity. *Horne, supra*, 216 Va. at 117, 215 S.E.2d at 456.

Notwithstanding the scope of Owens' request for preliminary injunctive relief, the Court will grant only an injunction restraining the director from issuing a building permit pursuant to the certificate of appropriateness. The Court finds that the September 11, 2007, certificate of appropriateness does not address demolition of the building heretofore existing on the site of CSL's proposed church addition, i.e. The Guild House. Thus, this litigation does not encompass demolition of that historic building. Moreover, Owens previously unsuccessfully litigated issues respecting that demolition. See, *Anne Owens et al. v. City Council of the City of Norfolk et al.*, Circuit Court of Norfolk, Case Nos. CL05-1334 and CL05-1377. Finally, the law of injunctions mandates that courts narrowly tailor any relief granted to address only the specific and immediate issues requiring the maintenance of a status quo. See, e.g., *Tran v. Gwinn*, 262 Va. 572, 584-85, 554 S.E.2d 63, 70 (2001).

In its Answer to the Amended Complaint for Declaratory and Injunctive Relief, the City denies Owens' substantive allegations regarding any state law or federal constitutional violations, contends that Owens lacks standing to pursue the litigation, claims that she is barred by principles of res judicata, and argues that CSL is a necessary, indispensable party to this litigation and that, unless Owens joins CSL as a party defendant, "no relief that would affect its property rights in the challenged approval can be granted." To date, neither party has requested leave of court to join CSL as a party defendant, and CSL, although fully aware of the litigation, has not sought to intervene herein. Indeed, on September 11, 2007, the date the City Council approved CSL's certificate of appropriateness, CSL's Second Century Committee chairman testified in this litigation. CSL has charged that committee with overall responsibility for the funding of and efforts to construct the church addition made subject of the certificate of appropriateness at issue in this case.

The Court resolved the City's other affirmative defense in its December 14, 2007, Order which denied the City's motion to dismiss, overruled the City's demurrer to Owens' amended complaint in nearly all respects, and overruled the City's special pleas in bar.

## II. *Standing*

The Court first turns to the City's assertion that Owens lacks standing to pursue this litigation.

In *Cupp v. Fairfax County Board of Supervisors*, the Court discussed standing in the context of a suit for declaratory relief. *Cupp*, 227 Va. 580, 589, 318 S.E.2d 407, 411 (1984). The Court stated that, "[i]n asking whether a person has standing, we ask, in essence, whether he has a sufficient interest in

the subject matter of the case so that the parties will be actual adversaries and the issues will be fully and faithfully developed." *Id.* The Court favorably quoted the U.S. Supreme Court's foundational statement respecting standing:

> The essence of the standing inquiry is whether the parties seeking to invoke the Court's jurisdiction have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions."

*Id.*, quoting, *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 72 (1978).

The General Assembly in Va. Code § 8.01-191 states that the declaratory judgment statutes are "remedial" in nature with a purpose "to afford relief from the uncertainty and insecurity attendant upon controversies over legal rights without requiring one of the parties interested so to invade the rights asserted by the other as to entitle him to maintain an ordinary action therefor. It is to be liberally interpreted and administered with a view to making courts more serviceable to the people." Va. Code § 8.01-184 requires that an "actual controversy" exist and specifically includes controversies respecting municipal ordinances among the objects of its inclusion. See also, *Fairfax County Board of Supervisors v. The Southland Corp.*, 224 Va. 514, 520-21, 297 S.E.2d 718, 721 (1982) (wherein the Court discussed the statutory scheme's inclusive purposes within the context of litigation involving the validity of local zoning provisions).

In this litigation, Owens presents a facial challenge to a specific portion of the City's zoning ordinance on the grounds that it exceeds the scope of enabling statutory authority and violates provisions of the federal constitution. In addition, she challenges a specific municipal decision pursuant to that zoning ordinance as applied to her real property interests within the HC-G2 District.

One aspect of the City's attack on Owens' standing asserts that she ostensibly seeks to "appeal" City Council's September 11, 2007, decision to grant the certificate of appropriateness. The City next points out that pursuant to zoning ordinance § 9-0.4(m), only "applicants for certificates of appropriateness" enjoy appellate rights. *See*, Va. Code § 15.2-2306(A)(3). Indeed, in that regard, the City seeks to assert the preclusive effect of this Court's decision in *Anne Owens et al. v. City Council of the City of Norfolk et al.*, Civil Action Nos. CL05-1334 and CL05-1337.

The Court rejects this aspect of the City's objection to Owens' standing. As noted above, the focus of Owens' declaratory judgment action rests upon the validity, facially and as applied to her property interests, of specific zoning ordinance provisions and decisions thereunder. She does not seek participation in the certificate of appropriateness process outlined by zoning ordinance § 9-0.4. Although privity between the parties exists in this litigation and Owens' prior litigation, the factual and legal context of this litigation differs so substantially from the former litigation that no preclusive effect arises herein from the outcome of that litigation. *See*, Rule 1:6 of the Rules of the Supreme Court of Virginia.

The factual record reveals that Owens owns and resides in an historic structure located in the HC-G2 District at the corner of Redgate and Blow Avenues, a distance of two to three blocks from the CSL building addition site. Owens can see that CSL property from her home throughout the year. She purchased her home in 1999 and then paid $320,000 for it; since then she has invested nearly $250,000 in restorations and improvements. She testified that all work performed on her home, sometimes at substantial additional expense to her, sought to "restore what is still there from the original house or to return the house to what it would have been like in its original state." As to modernizing improvements, such as air conditioning, she contracted for its installation so as to avoid disruption of the home's historic structural integrity and interior and exterior architectural details.

In discussing the HC-G2 District wherein she resides, Owens explained that:

> I bought this particular house because — well, it is an historic house. It was built in 1898, and it retained incredible architectural detail from its original days. And so I believed that it could be beautifully restored, given that it still had all of its original architectural character that was there.
>
> I also bought this particular house because I believed that the Historic Ordinances that were in place ensured that my investment in purchasing the house and in restoring the house was going to be protected by the City Ordinance and was even encouraged by the City Ordinance. . . .
>
> Well, there again, I think someone who wants to live in a house that is listed on the National Historic Register, having that designation would be very important to them. I think the historic district designation also provides a focus on the community as a designated historic district that has value above and beyond just

old buildings. . . . I think that the ordinance has more impact on the increase in value in the houses in Ghent than any other single factor, because the way the ordinance was written and is provided, it is almost like restrictive deed covenants when you buy a house. It sets out very specifically the rules by which any property owner in that district must abide, and so it assures you as a buyer, that, yes, you are going to be required to adhere to all those rules, but you have the absolute assurance from that ordinance that every other property owner is going to be held to those same standards. The ordinance includes standards for all kinds of aspects of construction, but also maintenance of historic properties, and so it is imperative for any owner of an historic property in Ghent to maintain that property to the standards that are set by the ordinance.

*Testimony of Anne Owens*, February 4, 2008 (and incorporating testimony of March 1, 2006, in the litigation styled, *Anne Owens et al. v. City of Norfolk City Council et al.*, Circuit Court of Norfolk, Case. No. CL05-1805.) The plaintiff's understanding and discussion of the HC-G2 district regulations, in general, conforms to the Statement of Intent found in zoning ordinance § 9-0.1 regarding Norfolk's historic districts and the provisions of zoning ordinance § 9-1 Purpose Statement, which pertains specifically to the Ghent Historic and Cultural Conservation Districts HC-G1, HC-G2, and HC-G3.

In essence, Owens' home represents a very typical example of an historic building that constitutes the object of the zoning regulations of and architectural preservation within Norfolk's historic districts. Over the course of approximately nine years, she has invested well over one-half million dollars in a residence she purchased with a specific intent to enjoy the legal protections of the City's historic district regulations.

In *James City County Board of Supervisors v. Rowe*, 216 Va. 128, 132-33, 216 S.E.2d 199, 204-05 (1975), the Court discussed at some length the justiciability of a district landowner's claim of facial invalidity of provisions within a zoning ordinance. In that declaratory judgment action, the Court quoted prior case law to note that the legality of an ordinance is tested not only by what actions already have been taken under its provisions, but also by what municipal actions may be taken pursuant to those provisions. *Id.*, quoting, *City of Winchester v. Glover*, 199 Va. 70, 72, 97 S.E.2d 661, 663 (1957). The Court went on to state that:

> When, as here, a property owner alleges that a zoning ordinance creates discriminatory, arbitrary, and capricious classifications bearing no substantial relation to the public health, safety, or welfare, or . . . that a zoning ordinance is otherwise unconstitutional, and that he has suffered damage to his property located in a district affected by such ordinance, he has stated a case of actual controversy within the meaning of [Va. Code § 8.01-184] and one that is "ripe for judicial adjustment."

(Clarification added.)

Regarding Owens' claim that City Council's September 11, 2007, decision to issue a certificate of appropriateness to CSL to construct a 53 foot building addition represents an "illegal variance" and will economically harm her property interests, the Court turns for guidance to the definition of an "aggrieved person" as mentioned in Va. Code § 15.2-2314 and articulated in *Virginia Beach Beautification Commission v. City of Virginia Beach Board of Zoning Appeals*, 231 Va. 415, 419-20, 344 S.E.2d 899, 902-03 (1986):

> The term "aggrieved" has a settled meaning in Virginia when it becomes necessary to determine who is a proper party to seek court relief from an adverse decision. . . . [I]t must affirmatively appear that such person had some direct interest in the subject matter of the proceeding that he seeks to attack. *Nicholas v. Lawrence*, 161 Va. 589, 592, 171 S.E. 673, 674 (1933). The petitioner "must show that he has an immediate, pecuniary and substantial interest in the litigation, and not a remote or indirect interest." *Id.* at 593, 171 S.E. at 674. . . . The word "aggrieved" in the statute contemplates a substantial grievance and means a denial of some personal or property right, legal or equitable, or imposition of a burden or obligation upon the petitioner different from that suffered by the public generally. *Insurance Ass'n v. Commonwealth*, 201 Va. 249, 253, 110 S.E.2d 223, 226 (1959).

In her amended complaint and her testimony, Owens variously states that the City's actions represent a genuine threat of economic harm to her investment in her residence through damage to her neighborhood's character as protected by zoning district regulations. She further asserts that, by acting without statutory enabling authority and otherwise unconstitutionally, again

with respect to her real property interests, the City's actions represent *ultra vires* exercises of power and result in deprivations of her protected procedural and substantive rights.

In light of the record before it, the Court finds that Owens possesses legal standing to pursue the declaratory and injunctive relief prayed for in this litigation.

### III. *Necessary Parties*

As noted, the Court herein considers only Owens' request that the director be enjoined from issuing to CSL a building permit pursuant to the September 11, 2007, certificate of appropriateness. CSL already possesses a permit to demolish The Guild House. No evidence exists to establish that CSL has applied for a building permit pursuant to that certificate of appropriateness, although the testimony of CSL's Second Century Committee chairman clearly indicates CSL's intention to do so upon completion of The Guild House demolition and solidifying adequate funding for the building addition.

With respect to necessary parties, in *Asch v. Mount Vernon Yacht Club*, 251 Va. 89, 90-91, 465 S.E.2d 817, 818 (1996), the Court quoted previous cases to enunciate the following broad definition:

> Where an individual is in the actual enjoyment of the subject matter, or has an interest in it, either in possession or expectancy, which is likely either to be defeated or diminished by the plaintiff's claim, in such case he has an immediate interest in resisting the demand, and all persons who have such immediate interests are necessary parties to the suit. . . . We have also held that a court lacks power to proceed with a suit unless all necessary parties are before the court.

*Asch*, at 90-91 (citations omitted).

In *Bonsal v. Camp*, 111 Va. 595, 597-98, 69 S.E. 978, 979 (1911), the Court favorably quoted U.S. Supreme Court authority to effectively distinguish between proper and necessary parties, and to delineate as to each category the scope of relief a trial court properly can grant:

> There is a class of persons having such relations to the matter in controversy, merely formal or otherwise, that they may be called proper parties, the court will take no account of the omission to make them parties. There is another class of persons whose

relations to the suit are such, that if their interests and their absence are formally brought to the attention of the court, it will require them to be made parties, if within its jurisdiction, before deciding the case; but if this cannot be done, it will proceed to administer such relief as may be in its power between the parties before it. And there is a third class, whose interest in the subject matter of the suit, and in the relief sought, are so bound up with that of the other parties, that their legal presence as parties to the proceeding is an absolute necessity, without which the court cannot proceed. In such cases the court refuses to entertain the suit, when these parties cannot be subjected to its jurisdiction.

*Id.*, quoting, *Barney v. Baltimore City*, 73 U.S. (6 Wall.) 280, 18 L. Ed. 825 (1868).

The Court finds that CSL constitutes a proper, yet not a necessary party with respect to Owens' claim for preliminary injunctive relief. That relief, properly limited in scope, merely will maintain a status quo pending the ultimate outcome of the case. At the February 4, 2008, hearing, Owens testified that The Guild House demolition appeared to be progressing. She presented an exhibit (Plaintiff's Exhibit 2) during that proceeding which contained numerous documents detailing The Guild House demolition project, that included among many other things disconnection of power and utilities, asbestos removal, varied forms of inspections and certifications, structural demolition, and site clearance. CSL's Second Century Committee chairman forecast this detailed, expensive, and time-consuming process in his September 11, 2007, testimony. Until this phase of activity concludes, CSL cannot build upon the site. Thus, as a result of preliminary injunctive relief, CSL will suffer no deprivation of its rights under or defeat of any immediate expectancy of a building permit issued pursuant to the certificate of appropriateness.

However, CSL represents a necessary, indispensable party to a determination of this litigation on the merits and the case cannot proceed further toward its conclusion until CSL joins the litigation. That is, should Owens prevail in this case, CLS's right to obtain a building permit pursuant to the certificate of appropriateness and its eventual expectancy to construct its proposed 53-foot tall building addition would suffer substantial impairment or extinguishment.

Therefore, the Court will enter an order consistent with the above findings, granting Owens twenty-one days to join CSL as a party-defendant pursuant to Rule 3:12, or to successfully invite CSL to intervene in the

litigation pursuant to Rule 3:14, or face dismissal of the lawsuit. That order effectively will stay further proceedings during that twenty-one day period, including the taking of discovery depositions. The Court will permit the parties to respond to outstanding interrogatories, requests for production of documents, and requests for admissions.

### IV. *Preliminary Injunctive Relief*

#### A. *Applicable Test*

The Virginia Supreme Court has not itself articulated a specific, elemental test respecting the issuance of preliminary injunctive relief. As a result, trial courts most frequently rely upon either traditional equitable principles or statutory criterion to guide them in the issuance of such injunctions. See generally, *Carbaugh v. Solem*, 225 Va. 310, 314-15, 302 S.E.2d 33, 35 (1983); *Wright v. Castles*, 232 Va. 218, 224, 349 S.E.2d 125, 129 (1986).

This case requires adherence to traditional equitable principles in the issuance of preliminary injunctive relief, and, to that end, Owens initially must demonstrate that she lacks an adequate remedy at law. See, *Wright, supra*. Beyond the foundational requirement of that showing, the Court finds instructive the balance of interests test of equitable considerations determinative of preliminary injunctive relief found in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 194-95 (4th Cir. 1977); and, accord, *Hughes Network Systems, Inc. v. Interdigital Communications Corp.*, 17 F.3d, 691, 693-94 (4th Cir. 1994). See also, *Hardinge, Inc. v. Buhler*, 72 Va. Cir. 39 (Amherst County 2006); *Hoy v. City of Alexandria*, 70 Va. Cir. 79, 81 (Alexandria 2005).

In *Blackwelder*, the court stated a "balance-of-hardship" test that focuses on the following elements: (1) the likelihood of irreparable harm to the plaintiff if preliminary injunctive relief is denied; (2) the likelihood of harm to the defendant if such relief is granted; (3) the likelihood of the plaintiff's success upon the merits of the case; and (4) the public interest stake in the litigation. *Id.*, 550 F.2d at 194-95; *Hughes*, 17 F.3d at 693. In balancing the interests of the plaintiff and the defendant, should it appear that the plaintiff stands to suffer the most significant hardship, then the examination of plaintiff's likelihood of success on the merits diminishes in importance to the court's decision-making. *Id.* As stated in *Blackwelder*, "the decision to grant or deny a preliminary injunction depends upon a "flexible interplay" of all the factors considered." 550 F.2d at 196.

## B. *Adequacy of Legal Remedy; Irreparable Harm to Owens*

The Court finds that Owens possesses no adequate remedy at law and stands to suffer irreparable harm absent issuance of preliminary injunctive relief. Significantly, she expresses great concern about her own property's value and places damage to her property interests at issue in the case. What economic damages she might incur appear difficult to calculate. Such near-incalculability militates in her favor under the *Blackwelder* analysis. See discussion, *Blackwelder*, 550 F.2d at 196-97.

Moreover, Owens' claims focus on the alleged illegality and unconstitutional nature of the City's actions and the threat such actions pose to the protection and integrity of the traditional residential land uses and historic character of the district wherein her residence lies. If the City's actions violate Dillon's Rule or are determined to be unconstitutional, money damages will not serve to adequately compensate Owens. That is, if the City issues a building permit to CSL that results in construction of a church addition out of character with the HC-G2 District's intent and protections, money cannot restore to Owens or the neighborhood the full integrity of the district's previous historic character. In addition, legal requirements that the City act pursuant to enabling legislation and within constitutional limitations does not necessarily implicate money damages. Therefore, Owens does establish the existence of a palpable danger of irreparable harm to her protected legal and private property interests absent issuance of preliminary injunctive relief.

Having made this conclusion, the Court will comment here on the magnitude of the potential irreparable economic harm. The Court finds the degree of potential harm to Owens as moderate in nature. Some two to three blocks separate her property from the construction site, although that site remains visible to her throughout the year. The City's alleged illegal and unconstitutional acts pertain only to the district's height limitations respecting a single proposed structure. The marginal influence of the anticipated addition to CSL upon the entirety of the HC-G2 District, its historical character, and values, while perhaps of nearly incalculable impact, necessarily appears incremental and not broad or far reaching in scope.

## C. *Potential Harm to the City*

The Court finds that the City likely will incur little if any harm upon granting of the preliminary injunction.

Obviously, the City possesses a very strong interest in the ultimate outcome of the case. The plaintiff seeks invalidation of provisions within its zoning ordinance and, specifically, places at risk a portion of its scheme for administration of historic districts. The viability of the certificate of appropriateness process implicates not only maximum height regulation within such districts, but also minimum height regulation. See, Zoning Ordinance §§ 9-1.8 and 9-2.8. However, focusing on the potential scope of a preliminary injunction, to delay issuance of a single building permit in one of Norfolk's historic districts yields little if any potential harm to the City.

## D. *Balance of Hardships*

Thus, having found that the plaintiff, absent entry of the preliminary injunction, faces a probability of irreparable harm and that the City bears little prospect of harm from issuance of such relief, the balance of interests analysis clearly favors the plaintiff's request for such relief. As noted in *Blackwelder, supra*, 550 F.2d at 195, "[i]t will ordinarily be enough that the plaintiff has raised substantial questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for litigation and thus for more deliberate investigation." Quoting, *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740, 743 (2d Cir. 1953).

## E. *Likelihood of Success on Merits*

Notwithstanding the above noted conclusions, in its consideration of the flexible interplay of factors relevant to the issue of preliminary injunctive relief, the court believes it important to discuss to some extent Owens' likelihood of success on the merits of this litigation. See *Blackwelder, supra*, 550 F.2d at 194-96; *Hughes, supra*, 17 F.3d at 693. Indeed, as noted above, Virginia case law firmly establishes that municipal zoning ordinance provisions enjoy a presumption of correctness and, at trial, Owens will bear the burden of rebutting that presumption. See, *Fairfax County Board of Supervisors v. Horne, supra*, 216 Va. at 117-18, 215 S.E.2d at 456; *Cupp v. Fairfax County Board of Supervisors, supra*, 227 Va. at 596-97, 318 S.E.2d at 415-16; *Fairfax County Board of Supervisors v. Carper*, 200 Va. 653, 660, 107 S.E.2d 390, 395 (1959).

Zoning ordinances result from legislatively granted authority for local governments to regulate land use pursuant to the police power. *Cochran v. Fairfax County Board of Zoning Appeals*, 267 Va. 756, 764-65, 594 S.E.2d 571, 576-77 (2004); *Fairfax County Board of Supervisors v. Snell Constr.*

104

*Corp.*, 214 Va. 655, 658-59, 202 S.E.2d 889, 892-93 (1974); *West Brothers Brick Co. v. City of Alexandria*, 169 Va. 271, 281-82, 192 S.E. 881, 885 (1937). Nevertheless, localities must exercise this authority within statutory limitations or else courts will declare it void. *Augusta County Board of Supervisors v. Countryside Investment Co.*, 258 Va. 497, 502-03, 522 S.E.2d 610, 612-13 (1999). In addition, the validity of zoning ordinance provisions must comport with constitutional due process and equal protection requirements. *West Brothers Brick, supra*, 169 Va. at 281, 192 S.E. at 885; *Carper, supra*, 200 Va. at 660, 107 S.E.2d at 395; *City of Manassas v. Rosson*, 224 Va. 12, 17-19, 21, 294 S.E.2d 799, 802, 804 (1982). As stated in *James City County Board of Supervisors v. Rowe*, 216 Va. at 137, 216 S.E.2d at 208, "[i]n determining the constitutional scope of the zoning police power delegated to local governments in Virginia, we look first to our own enabling statutes."

In Va. Code § 15.2-2280, the General Assembly granted political subdivisions authority to enact zoning ordinances dividing territory into specific districts and regulating land use therein, including, specifically, height limitations. The City's zoning ordinance regulates the maximum height of structures in most districts, including Norfolk's residential districts. See, e.g., Zoning Ordinance §§ 4-1 through 4-13, 9-1 through 9-4.

The General Assembly recognized that, in so dividing and regulating land use, at times, a specific use limitation or regulation might work a deprivation so great upon a particular landowner as to constitute a "taking" of one's property without just compensation, that is, a due process violation. *Cochran, supra*, 267 Va. at 764-65. Therefore, to protect the viability of zoning ordinances, the General Assembly enabled localities to avoid such unjust results by allowing for variances or special exceptions to district regulations. See, Va. Code §§ 15.2-2201 and 15.2-2286(A)(1); and see also, Va. Code §§ 15.2-2285(F), 15.2-2309 through 15.2-2314. To that end, the City's zoning ordinance includes provisions for landowners to obtain variances and special exceptions. See, Zoning Ordinance §§ 22-1 et seq. and 25-1 et seq.

With respect to zoning district maximum height limitations, the Virginia Supreme Court has recognized two methods by which a landowner may obtain relief, through granting of a variance or through issuance of a special exception. *Bell v. City of Charlottesville*, 224 Va. 490, 496, 297 S.E.2d 810, 813-14 (1982). The City's zoning ordinance does not purport to offer relief from maximum height restrictions through issuance of special exceptions. Instead, for all residential districts except Norfolk's Ghent and

West Freemason historic districts, landowners must apply to the BZA for a variance to obtain relief from the applicable maximum height restriction. To obtain a variance, a landowner must make several very specific showings. *See,* Zoning Ordinance §§ 22-4, 22-6, and 22-7; Va. Code § 15.2-2309; and see, *Prince William County Board of Zoning Appeals v. Bond,* 225 Va. 177, 179-81, 300 S.E.2d at 781, 782-83 (1983); *Cochran,* 267 Va. at 764-65, 594 S.E.2d at 576. Persons aggrieved by the decision of a local board of zoning appeals to grant a landowner a variance enjoy considerable procedural protections; an adverse decision can result in a petition to the locality's circuit court and such persons ultimately may seek appellate review by the Virginia Supreme Court. *See, Virginia Beach Beautification Commission, supra,* 231 Va. at 417-18, 344 S.E.2d at 901-02.

In Va. Code § 15.2-2306, the General Assembly enabled localities to adopt ordinances designed to facilitate preservation of historical sites and architectural areas.[2] In that statute, local governing bodies may establish review boards to administer historic preservation ordinances, and the "ordinance may include a provision that no building or structure, including signs, shall be erected, reconstructed, altered, or restored within any such district unless approved by the review board or, on appeal, by the governing body of the locality as being architecturally compatible with the historic landmarks, buildings, or structures therein." *See,* Va. Code § 15.2-2306(A)(1). This enabling legislation also empowers the locality to prohibit a landowner from razing, demolishing, or moving a landmark, building, or other structure within the district until approved by the review board or, on appeal, by the locality's governing body. *See,* Va. Code § 15.2-2306(A)(2). As noted above,

---

[2] Traditionally, under Virginia jurisprudence, localities could not regulate land use when aesthetic considerations constituted the political subdivision's exclusive motivation. In *Kenyon Peck, Inc. v. Kennedy,* 210 Va. 60, 64-65, 168 S.E.2d 117, 120-21 (1969), the Court stated: "There is a generally accepted rule that a state, municipality, or county cannot limit or restrict the use which a person may make of his property under the guise of its police power where the exercise of such power would be justified solely on aesthetic considerations. However, aesthetic considerations are not wholly without weight and need not be disregarded in adopting legislation to promote the general welfare. *West Brothers Brick Co. v. Alexandria, supra,* 169 Va. at 282, 283, 192 S.E. at 885, 886; 16 Am. Jur. 2d, *Constitutional Law,* § 292, pp. 569-72, and the cases there cited in the footnotes. . . . Although aesthetic considerations alone may not justify police regulations, the fact that they entered into the reasons for the passage of an act or ordinance will not invalidate it if other elements within the scope of the police power are present." (Citations omitted.)

localities may determine for themselves what persons enjoy such appellate rights to their governing bodies and to the courts. See, Va. Code § 15.2-2306(A)(3); *Mann v. Loudoun County Board of Supervisors* (Loudoun County, Feb. 12, 2008).

Within its zoning ordinance, the City enacted numerous provisions pursuant to this legislative authority. See, Zoning Ordinance § 9-0 et seq. The district regulations for the HC-G2 District are found at zoning ordinance § 9-1.1 through 9-1.9. With respect to certificates of appropriateness to erect buildings or structures greater than 35 feet in height, only the applicant therefor enjoys any appellate rights. Zoning Ordinance § 9-0.4(m). That proscription of appellate rights constitutes the gravamen of Owens' statutory and constitutional-based claims in this litigation. Significantly, Va. Code § 15.2-2306 enabling provisions do not include language pertaining to height regulation within historic districts and do not otherwise appear to supplant the existing statutory scheme enabling localities to enact and administer zoning ordinances respecting land use within their jurisdictions.

The City counters Owens by maintaining that, in the HC-G2 District, as in other historic districts, the maximum and minimum height restrictions for the district as contained in § 9-1.8(a) and (b) must be read in conjunction with § 9-1.8(c) which states:

> *Variations from height limits*: Notwithstanding the above provisions, where certificates of appropriateness approve greater or lesser heights, on grounds of existing conditions, relationships to adjacent buildings and open space, protection of views, or similar considerations, such heights shall be permitted as authorized variations from the height requirements established in § 9-1.8(a) and (b).

The City argues that this tripartite section forms, in effect, a flexible approach to height-related limitations within the district, with higher (and lower) heights permitted so long as they meld well with surrounding buildings and structures so as to harmonize with and preserve the historic character of the neighborhood. *See,* testimony on September 6, 2007, of Leonard M. Newcomb, III, Zoning Administrator, at pages 33, 35, 42, 44-45, 53-54, 56-58, and 62.

Nevertheless, both through the testimony of its zoning administrator and in argument before the Court, the City concedes that the 35 foot maximum height limitation must be obeyed absent specific governmental review and permission as provided for through the certificate of appropriateness process. Absent such governmental relief from the maximum height limitation of zoning ordinance § 9-1.8(a), a landowner may not lawfully erect any building or structure taller than 35 feet. That is, as in other residential zoning districts wherein relief from district height regulations must be procured through the variance process, in the HC-G2 District, the district maximum height regulation of 35 feet pertains to all landowners absent contrary governmental permission. Yet, in that district, such permission to exceed the maximum height restriction comes exclusively through a process that, in effect, always denies procedural protections to surrounding landowners or other potentially aggrieved persons.

Height limitations constitute a fundamental and traditional element of zoning district land use regulation. See, Va. Code § 15.2-2280(2). This fact holds true for the HC-G2 District notwithstanding that it also constitutes an historic district within Norfolk. To date in this litigation, the City has not put forward any authority evidencing that provisions within the Virginia Code enable it to substitute the certificate of appropriateness process for that of a variance to gain governmentally-approved relief from a maximum height limitation in the HC-G2 District.

Indeed, Owens contends that the City has substituted a unique local process designed to safeguard historic and architectural concerns for those procedural processes statutorily mandated for relief from zoning district height regulations. Based upon the above discussion, and absent the City's presentation of contrary authority, the Court concludes that Owens enjoys a substantial likelihood of success on the merits of her claim that the City's certificate of appropriateness process violates Dillon's Rule by exceeding the scope of applicable enabling legislation.

F. *Procedural Due Process*

In addition, even should the City present authority to undergird its approach to maximum height regulation in its historic districts, any process which does so in a way that precludes aggrieved persons from pursuing administrative review and or appellate redress in the courts raises serious procedural due process questions. Land use regulation necessarily seeks to strike the delicate balance between private property rights and the public interest. See, *Fairfax County Board of Supervisors v. Snell, supra,* 214 Va.

at 657-58; *Cole v. Waynesboro City Council*, 218 Va. 827, 834, 241 S.E.2d 765, 770 (1978); *Fairfax County Board of Supervisors v. Horne*, 216 Va. 113, 120, 215 Va. 453, 458 (1975). Within the borders of a zoning district, landowners' property rights and economic interests may well conflict when one landowner seeks relief from the strictures of a given district regulation. Adequate procedural processes to provide a forum for such competing private property considerations clearly underlies Virginia's statutory scheme respecting the administrative review and appellate rights afforded to allegedly aggrieved persons. See, *Virginia Beach Beautification Commission, supra*, 231 Va. at 419-20, 344 S.E.2d at 902-03; and see, Va. Code § 15.2-2309 et seq.

In *Sunrise Corp. v. City of Myrtle Beach*, 420 F.3d 322 (4th Cir. 2005), cert. denied, 547 U.S. 1039, 122 S. Ct. 1618, 164 L. Ed. 2d 333 (2006), the Court listed the elements of a procedural due process claim:

> To establish a violation of procedural due process, plaintiffs must show that (1) they had property or property interests; (2) of which the defendant deprived them; (3) without due process of law. *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 826 (4th Cir. 1995).

It appears to the Court that, with respect to relief from the maximum height restriction in an HC-G2 district, the City's certificate of appropriateness process may well violate this standard and Owens therefore enjoys a likelihood of success on the merits of her procedural due process claim.

G. *Substantive Due Process*

With respect to Owens' substantive due process claim, it appears to the Court that she enjoys little or no prospect of success on the merits. See, *Sunrise Corp.*, 420 F.3d at 328; and *Helping Hand, L.L.C. v. Baltimore County, Md.* (4th Cir. Feb. 12, 2008), 2008 U.S. App. LEXIS 3092, (wherein the Court states that to "prevail on a substantive due process claim, a party must establish (1) that it had property or a property interest; (2) that the state deprived it of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency.") (citations omitted). The genus of Owens' claim alleges a procedural, not substantive, violation of her federal constitutional right to due process of law.

Finally, turning to Owens' assertion of a denial of equal protection, the Court concludes that she certainly presents a colorable claim and that there exists a reasonable prospect that she will prevail upon it at trial.

In *Sunrise Corp., supra*, 420 F.3d at 328, the Court held, "that a party can bring an equal protection claim by alleging that it had been intentionally treated differently from others similarly situated and that there was no rational basis to support the different treatment." (Citations omitted.) The Court went on to explain that, to prevail upon such a claim, the plaintiff must show that the classification into which the government places him resulted from something beyond disparate treatment alone, but rather, intentional, purposeful discrimination. *Id.* at 328-29. Within the zoning context, the Virginia Supreme Court has spoken to equal protection claims in terms of examining whether the governmental classification is "reasonable not arbitrary . . . and bears a rational relationship to a permissible state objective." See, *City of Manassas v. Rosson*, 224 Va. 12, 18 294 S.E.2d 799, 802 (1982). Notwithstanding the rebuttable presumption of validity of local zoning legislation, the Court noted in *Rosson*, "that no matter how legitimate the legislative goal may be, the police power may not be used to regulate property interests unless the means employed are reasonably suited to the achievement of that goal." *Id.*, quoting, *Alford v. Newport News*, 220 Va. 584, 586, 260 S.E.2d 241, 243 (1979).

In this case, the equal protection analysis at trial necessarily will focus critically on the rational basis for and reasonableness of the impact on putative aggrieved persons of the certificate of appropriateness process for obtaining relief from the HC-G2 district maximum height limitation.

## I. *Public Interest*

The Court finds that maintaining the status quo between Owens and the City pending trial will serve the public interest. All citizens gain when a government acts lawfully and correctly pursuant to constitutional and statutory grants of and limitations upon governmental authority. Norfolk citizens likewise share an interest in preservation of the City's historical and architecturally unique neighborhoods, kept in proper balance with competing considerations of property owners' interests, the need for evolving development and redevelopment, and proper police power exercise.

## V. *Conclusion*

For the reasons stated above, the Court will grant a portion of the preliminary injunctive relief that Owens requests. The injunction will prohibit the director from issuing any building permit pursuant to the certificate of appropriateness issued to CSL on September 11, 2007. Absent further order respecting the duration of the preliminary injunction, it will remain effective until July 1, 2008, or the entry of final judgment following a trial upon the merits of the case, whichever event first occurs. The Court hereby requires the parties to convene within five business days of the date of this letter opinion to present to the Court their respective positions on the bond that Owens must post prerequisite to the issuance of the preliminary injunction.